## Case No. 2,974.

### In re COLE.

[1 MacA. Pat. Cas. 539.]

Circuit Court, District of Columbia.   Oct., 1857.

#### PATENTS—NOVELTY—UTILITY.

[Where each one of the features of an improvement, separately considered, strongly resembles known things and known results, to which it has been assimilated, but, when considered as a whole, the combination differs from each and all in the specific results of the parts, and accomplishes the desired result of manufacture with a saving of material and of operative force, it amounts to something more than "placing known means in a certain position;" and, if a positive benefit will result to the trade, the novelty of the invention should not be too vigorously questioned, especially as, if there be real patentable novelty, a refusal to grant the patent would work irremediable injury, and, if the combination be not substantially new, the fact of the patent will not prevent the public from using it.]

[Appeal from the commissioner of patents.

[Application of Richard H. Cole for letters patent for an improved machine for making metallic nuts. From a decision of the commissioner of patents rejecting the application, the applicant appeals.

[The patent was subsequently issued to the applicant, October 27, 1857, and is numbered 18,499.]

Z. C. Robbins, for appellant.

MERRICK, Circuit Judge. The claim of the applicant in this case lies so close upon the line which divides the new from the old in the arrangement of machinery to produce a better result in manufactures; or, rather, to be precise, comes so near to the principle of exclusion, on account of analogous use, that I have found great practical difficulty in placing him beyond the rule of exclusion. And did I construe the claim he has preferred to comprehend as much as the office has considered it to comprehend, I should feel obliged to affirm the judgment of rejection; and indeed that construction is itself so far from unreasonable that if the recent decisions upon this branch of law did not warrant, especially in the initiatory stages of an application, very large latitude for benignant interpretation, I should be further constrained to say that the construction placed upon the claim by the office was itself correct. But the claim, upon looking to all parts of the specification, may, I think, fairly be determined to amount to a claim for an improvement in the combination of machinery for the manufacture of metallic nuts by a preliminary shaping of the end of the heated metallic bar out of which the nut is to be made, so as to make it conform on all sides, save one, with the cross-section of the die box of the machine into which it is to be thrust by the punch, and this preliminary shaping to be further effected by means of an attachment to nut-making machines of vibrating jaws, to be operated and adjusted by the combination thereof in the way detailed in the specification, immediately in front of, and exactly opposite to, the mouth of the die box, by means of which the necessity of cutting off, by the punch, of more than one side of the nut is prevented, and all waste of metal from the sides of the bar is prevented, and power in operating the machine is saved. His invention is therefore limited not merely to a preliminary shaping of the bar by compression. This was no novelty. And as the claim stood and was construed before any amendment, it was well rejected. Nor is the invention limited only to a preliminary shaping in front of a die box irrespective of the especial agency by which, and of the extent to which, that shaping is accomplished, for without that additional limitation it would fall within the objection taken by the office of substantial identity with Griffith's machine. So, also, unless we regard the precise extent of this preliminary shaping connected with the especial benefits flowing from the order of its arrangement in the process of manufacture, it would be obnoxious to the objection of analogous use of the vibrating jaws in machines for making axes, spikes, &c., so forcibly urged in the written statements from the office. But the difference between this machine and Griffith's, both in the character and the adjustment of the compressing agency, and the extent of the preliminary shaping—that being effected here on all sides of the bar save one, and there no less than two sides, afterwards demanding a severing appliance—appears to furnish a distinction in the result produced. And in the machines for axes, &c., the vibrating jaws, although used for proximate shaping of the particular articles, are not shown to be combined in the same way, so as to give an absolute finish to the shape of the article in certain of its proportions at an important stage of the manufacture, nor so as to determine the precise amount of metal used; or, to vary the expression, to act as an ultimate and rigorously exact measure of form, size, and density. In each one of the features of the improvement, separately considered, there is strong resemblance to the known things and known results to which it has been assimilated; but when considered as a whole, the combination differs from each and all in the specific result of the parts; and appearing by the united action to accomplish the desired result of manufacturing a uniform-sized and perfect nut with a saving of material and of operative force, it amounts to something more than "placing known means in a certain position;" the process seems thereby to be substantially modified and improved and the trade to have derived a positive benefit.

Under all the circumstances, I am disinclined to question too rigorously the novelty of this

invention, especially when I consider that if there be real patentable novelty in the combination, a refusal to grant a patent would operate irremediable injury; whereas, if it be not substantially new, the patent will not prevent the public from the use of the combination; but being only prima-facie evidence in his favor, a jury of the country could protect a party charged with infringement upon evidence given that there is no novelty. Giving, then, to the applicant the full benefit of my doubt, as also of the most favorable interpretation of his claim, I am of opinion that there is error in the decision of the office. Perhaps in concluding this op'nion it may be allowed that I suggest to the applicant to amend his specification before the emanation of a patent, so as to make the language of his claim accord unequivocally with the intention which I have ascribed to the terms used therein.

[NOTE. A patent was subsequently issued to the applicant, October 27, 1857, and is numbered 18,499.]

## Case No. 2,975.

### In re COLE.

[8 Reporter, 105;[1] 7 Wkly. Notes Cas. 114.]

Circuit Court, E. D. Pennsylvania.    May 9, 1879.

PRACTICE—COMMISSION TO TAKE TESTIMONY—EXAMINATION—REGULARITY—COUNSEL AND CLIENT—PRIVILEGED COMMUNICATIONS—PERPETRATING CRIME.

1. Where a commission to take testimony has issued from the court of another circuit, and the aid of the court in whose jurisdiction the witnesses reside is sought to enforce it, the latter court will not inquire into the regularity of the issuance of the commission before compelling witnesses to answer.

2. Privileged communications between counsel and client are those which are lawful, and which relate to the business of the client, and fall within the scope of professional duty. A communication relating to the perpetration of a crime by the counsel is not privileged.

Motion for attachment. C. C. Cole, Esq., was of counsel for the Iowa Central Railroad, in a suit in the circuit court of Iowa, to foreclose a mortgage on said road. R. L. Ashhurst, Esq., was chairman of a committee of stockholders of the road; J. F. Cate was president of the said road; both the latter gentlemen were in frequent confidential communication with Cole, with reference to the litigation and matters connected therewith. During the case certain libellous publications appeared, attacking the character and motives of [Hon. John Dillon, United States circuit judge for the district of Iowa][2] the judge before whom the case was. Cole was charged with the authorship of said publications, and proceedings were had by the Iowa bar association for the purpose of disbarring him as intending to obstruct the course of justice; and a commission was directed by the cir-

[1] [Reprinted from 8 Reporter, 105, by permission.]

[2] [From 7 Wkly. Notes Cas. 115.]

cuit court of Iowa to a commissioner in the eastern district of Pennsylvania, directing him to take testimony. Before the commissioner, Messrs. Ashhurst and Cate refused to answer certain questions as to whether they had received certain letters from Cole, &c., on the ground that they were confidential communications between counsel and client. Attachments were then asked for.

Cook & Lane, for the motion.

E. G. Platt and J. C. Bullitt, contra.

BUTLER, District Judge. Two questions were raised: 1. That the circuit court of Iowa had no authority to issue the commission. 2. That the communications were privileged.

As to the first, I, as a judge, have no authority to inquire into the jurisdiction of the circuit court of Iowa, or whether or not there is there pending a civil action. That court has decided that question, and issued a commission. It would be highly discourteous to look behind its record, and I decline to do so.

Secondly, are the communications privileged? The general law in regard to privileged communications is well understood, and originated far back in the history of jurisprudence. How far, in modern times, the law has been modified, it is not now necessary to consider. It is sometimes said that all communications between counsel and client are privileged; but this is too general, and is inaccurate. They must relate to the business and interest of the client; and, moreover, they must be lawful; for, if unlawful, public policy forbids their concealment under the plea of privilege; and, if lawful, they must fall within the scope of professional duty. Communications by counsel to client, likewise, are usually privileged, because closely connected with the client's interest and business. See Weeks, Attys. at Law, p. 252. Suppose a case most favorable to the witnesses, viz., that these communications were by client to counsel, would they be privileged? I do not mean to imply any fault in these gentlemen. I have no doubt they are entirely free from blame. But suppose a client had devised, with the assistance of counsel, a scheme to obstruct the administration of justice, would the communications be privileged? The authorities applicable to such cases say not. The charge here is that Mr. Cole intended to promote perpetration of crime. Had it not been for the learned argument of counsel who opposed the motion, I should not have had the slightest doubt about the case. The matter does not fall within the scope of professional employment. Moreover, these communications have been already given to the public. The inquiry is not what they were, but who made them, and how are the client's interests affected by them? The protection is for the benefit of the client, not the counsel. I am of opinion